FILED
MAY 11 2021
Clerk, U.S. District Court
Texas Eastern

United States District Court
Eastern District of Texas

Case No. 5:21 cv 57

Ronnie H. Minnick, an individual Plaintiff

Vs

Defendants:
Gulfstream Park Racing Association, Inc.
MI Developments, Inc.
The Stronach Group, Inc., a Canadian Corporation

Petition For A Declaratory Judgment

The Plaintiff, Ronnie H. Minnick, is an adult resident of Garland County, Arkansas since 1990, and resides at 217 Lookout Point, Hot Springs National Park, Arkansas, and files this petition herein for a declaratory judgment pursuant to Federal Rules of Civil Procedure, Rule 57, Declaratory Judgment, giving this court the power to declare rights, status, and other legal relations between and among the parties; as is appropriate when a declaratory judgment will terminate the controversy giving rise to a proceeding and offers a speedy and inexpensive method of adjudicating legal disputes. There is an "actual and substantial controversy" between and among the parties affecting the legal rights of the parties. 28 U.S,C. Sec. 2201. The controversy arises with respect to the meaning of of **Rule 61D-7.XXX Rainbow 6)** and in particular the meaning of (2) **Unique Wager,** as used in this subsection, shall be defined as having occurred when the **total amount wagered** on a winning combination selecting the first place finisher in each of the six races is **equal to the minimum allowable wager.** The dollar amount in controversy under the contract is the sum of $1,476,336.00.

Defendants / Jurisdiction

The Defendants, Gulfstream Park Racing Association, Inc., 901 S. Federal Highway, Hallendale Beach, Florida, 33009, MI Developments Inc., 901 S. Federal Highway, Hallendale Beach, Florida, 33009, and The Stronach Group, 455 Magna Drive, Aurora, Ontario, Canada L4G7A9 own and operate racetracks across the United States including Santa Anita, Pimlico Race Course and in particular Gulfstream Park doing business at 901 S. Federal Highway, Hallendale Beach, Florida, 33009.

## 15 U.S. Code Chapter 57 - Interstate Horseracing

The U.S. Congress determined a need to regulate interstate commerce with respect to wagering on horse racing in order to further the horseracing and legal off-track betting industries in the United States and that in the area of interstate off-track wagering on horse races there was a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers, it being the policy of Congress to further horse racing and legal "off-track wagering" in the United States as an identifiable national interests establishing the "Interstate Horseracing Act of 1978".

Section 3002 (3) "Interstate Off-Track Wager" means a legal wager placed or accepted in one State with respect to the outcome of a horse race taking place in another State, and includes pari-mutuel wagers, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State.

Section 3002 (5) "Host State" means the State in which the horserace subject to the interstate wager takes place. In this instance, Gulfstream Park Racing Association, Inc., 901 S. Federal Highway, Hallendale Beach, Florida, Section 3002 (6) "Off-Track State" means the State in which an interstate off-track wager is placed and accepted. In this instance, Oaklawn Park Race Track situated at 2705 Central Avenue, Hot Springs National Park, Arkansas, 71901.
Section 3002 (22) Contractual terms and conditions between the parties, Host Track and Off Track, includes the percentage which is paid by the Off-Track betting system at Oaklawn Park Race Track situated at 2705 Central Avenue, Hot Springs National Park, Arkansas, 71901, to the Host Track Gulfstream Park Racing Association, Inc., 901 S. Federal Highway, Hallendale Beach, Florida,

Approval of interstate horseracing wagering must be obtained by consent of 1) Host State Racing Commission, 2) Off-Track State Racing Commission, 3) Horsemen's Group representing the majority of owners and trainers at the Host Track.

Contractual agreements exists between the Host Track Defendant, Gulfstream Park Racing Association, Inc., 901 S. Federal Highway, Hallendale Beach, Florida, and the Off Track Oaklawn Park Race Track situated at 2705 Central Avenue, Hot Springs National Park, Arkansas, 71901, for the placement of interstate wagers by the general public in Garland County, Arkansas, and the percentage payments to the Host Track, Gulfstream Park Racing Association, Inc., 901 S. Federal Highway, Hallendale Beach, Florida from the Off Track Oaklawn Park Race Track.

15 U.S. Code Section 3007 - Jurisdiction and Venue:  (a) The district courts of the United States shall have jurisdiction over any civil action under this chapter (among and between the parties) without regard to the citizenship of the parties or the amount in controversy. (c) The jurisdiction of the district courts shall be concurrent with that of any state court located in the host state or the off-track state.

The "Interstate Horseracing Act of 1978" clearly places jurisdiction of the Host Track Defendants in a federal district court in the "off-track" state of Arkansas, without regard to the citizenship of the parties; and that district court shall be concurrent with that of any state court located in the the off-track state of Arkansas.

Jurisdiction is proper because Plaintiff, Ronnie H. Minnick is a resident of Garland County, Arkansas.  The Defendants, the Host State, stream live for commercial gain by the use of electronic media as authorized and permitted by the "Interstate Horseracing Act of 1978" with the Off-Track Oaklawn Park Race Track situated at 2705 Central Avenue, Hot Springs National Park, Arkansas, 71901 of all of its horse racing activities.  In addition, the Defendants have established a "wagering platform" in conjunction with Oaklawn Park Race Track and Oaklawn Anywhere, a software program of Oaklawn Park Race Track, whereby wagers can be placed locally within the Off Track forum state with the Host Track Defendant and any winning proceeds can likewise be disbursed locally within the Off Tack forum state.  Substantial commercial revenues are realized by the Host Track Defendants annually by the interactive and interstate connection as permitted by the "Interstate Horseracing Act of 1978" with the activities occurring within the Off Track Forum State to make the exercise of jurisdiction over the Host Track Defendant reasonable.

Cause of Action

An "implied contract" was derived and created between the Plaintiff and Defendant by the conduct and general intention of the parties. First, the Defendants made an offer called the "Rainbow Pick 6" with the essential terms thereof set out in **(Rule 61D-7.XXX Rainbow 6)** and shown as Exhibit A attached hereto. Second, this offer was accepted by Plaintiff, Ronnie H. Minnick in the County of Garland, State of Arkansas, Third, the consideration (wagers) required was paid directly to the Defendants on the premises of Oaklawn Park Race Track. 2705 Central Avenue, Hot Springs National Park, Arkansas, thur "Oaklawn Anywhere" a software product of Oaklawn Park situated in Garland County, Arkansas. In order to accept the "implied contract" and "pay the required consideration (wager)" the Party Plaintiff was required to be a resident of the State of Arkansas.

This interactive commercial contact encompasses two-way online communication which fosters an ongoing business relationship with the Defendant's purposefully availing itself of this State's forum. Forth, the Plaintiff, Ronnie H. Minnick successfully performed the required task required of the "implied contract" according to the terms and conditions as set out in **(Rule 61D-7.XXX Rainbow 6)** and shown as Exhibits A attached hereto, and was entitled to the sum of $173,445.00 for the transaction of August 12, 2017 and the sum of $1,302,921.00 for the transaction of December 26, 2019. Fifth, the Defendants did not do what the "implied contract" called for under the terms and conditions of **(Rule 61D-7.XXX Rainbow 6), Exhibit A.** Thus the intentigation of this lawsuit.

**Rainbow Pick 6 / Cause of Action**

Among the wagering products of the Stronach Group is a Rainbow Pick Six (6) wager of Gulfstream Park. The Rainbow Pick Six (6) is designed for the average horse racing bettor to participate in the program as the ticket only cost .20 cents (.20). One horse for each race. Daily Gulfsteam Park advertising and promotion says **"You can change your life for .20 cents."** Gulfsteam President Tim Ritvo **"The beauty of the bet is that it cost just a dime"** (since changed to .20 cents) **"We designed the Rainbow 6 to be a life changing wager"**. Gulfstream Track Announcer prior to Race 5 on December 26, 2019, **"The Pick 6 ticket is only 20 cents, five for a $1.00."** The result of the misleading and deceptive information (resulting from the Gulfsteam intentional misinterpretation of their own Rainbow Pick rules) is that thousands of average American bettors across the United States are wagering on the Rainbow Pick Six for a minimum cost hoping to "change their lives".



The Rainbow Pick Six (6) rules are attached hereto (**Rule 61D-7.XXX Rainbow 6**) and marked as Exhibit A and pertinent parts are as follows:

**Rule 61D-7.XXX Rainbow 6**

(1) The Rainbow 6 requires selection of the first place finisher in each of six races. The entire net Rainbow 6 pool and carryover, if any, shall be distributed to the holder of a **unique wager** selecting the first place finisher in each of the selected six races. If there is no unique wager selecting the first place finisher in all six races, the major share of the Rainbow 6 pool shall be distributed as a single price pool to those who selected the first place finisher in the greatest number of races. The minor share shall be added to the, or create a, jackpot pool.

(2) **Unique Wager,** as used in this subsection, shall be defined as having occurred when the **total amount wagered** on a winning combination selecting the first place finisher in each of the six races is **equal to the minimum allowable wager.**

The terms and conditions of the agreement are to be judged "objectively" and not "subjectively" by personal opinions.

On August 12, 2017, Plaintiff herein, Ronnie Minnick, wagered a Rainbow Pick 6 twenty (.20) bet thru the Off-Track Oaklawn Anywhere, attached hereto as **Exhibit B**, on the following:

>  Race 7 # 8
>
>  Race 8 # 2
>
>  Race 9 # 4
>
>  Race 10 # 6
>
>  Race 11 # 8
>
>  Race 12 # 8  /  **Total cost of ticket: $.20 cents**

On December 26, 2019, Plaintiff herein, Ronnie Minnick, wagered a Rainbow Pick 6 twenty (.20) bet thru the Off-Track Oaklawn Anywhere, attached hereto as **Exhibit C**, on the following:

>  Race 5 # 8
>
>  Race 6 # 3
>
>  Race 7 # 7
>
>  Race 8 # 1
>
>  Race 9 # 1
>
>  Race 10 # 7 / **Total cost of ticket: $.20 cents**

1.

All were winners and both wagers constituted a **"unique wager"** under the Rainbow Pick Six (6) rules. The total amount wagered ($.20 cents) being equal to the minimum allowable wager ($.20 cents). There were no other "unique wagers" in the Pick Six on either dates. The entire net Rainbow 6 pool and carryover, if any, shall be distributed to the holder of a **unique wager** selecting the first place finisher in each of the selected six races. The Rainbow Pick 6 pool on August 12, 2017 was the sum of **$173,445.00** to which the Plaintiff herein is entitled. The Rainbow Pick 6 pool on December 26, 2019 was the sum of **$1,302,921.00** to which the Plaintiff herein is entitled. The plaintiff herein was only paid the sum of $3,689.38, a copy of which is attached hereto and marked Exhibit B for the transaction of August 12, 2017 and the sum of $177.80 marked as Exhibit C for the transaction of December 26, 2019.

(2) **Unique Wager**, as used in this subsection, shall be defined as having occurred when the **total amount wagered** on a winning combination selecting the first place finisher in each of the six races is **equal to the minimum allowable wager**, i.e **twenty cents (20)**

2.

Gulfstream responded on both instances that there were **other winning tickets**. The fallacy is Gulfstream not recognizing the difference between a **"unique ticket"** and a **"winning ticket"**. The other eleven (11) tickets were winning tickets, **but not qualifying as a unique ticket** as the eleven (11) other tickets contained a "combination of several horses" in each race **costing hundreds of dollars each**. The rule is simple:


(2) **Unique Wage**r, as used in this subsection, shall be defined as having occurred when the **total amount wagered** on a winning combination selecting the first place finisher in each of the six races is **equal to the minimum allowable wager. ($.20 cents)**.


The rule was specifically written and designed to prevent an otherwise **"unjust buying"** of the **"jackpot"** by wealthy bettors at the expense of the average horse bettor which has been the modus operandi at Gulfstream Park, as on May 25, 2014, a wealthy bettor paid $7,603.20 for a Rainbow Pick 6 ticket and collected $6,678,939.00. Gulfstream Park has routinely ignored its own Rainbow Pick 6 rules for the benefit of its wealthy bettors and patrons at the expense of the average race bettors who build up a substantial jackpot for the wealthy patrons to "buy the jackpot." **Yet, Gulfstream advertises and promotes: "You can change your life for $.20 cents"**.

3.

Prior to August 12, 2017, in **May 2017**, Plaintiff herein had several conversations with **marketing personnel at Gulfstream** as to the meaning of the Rainbow Pick 6 rules and its definition of a **"unique wager"** and was assured that it **meant, a single horse for each race (thus $.20 cent costs)** thus the rationale for the August 12, 2017, Pick 6 wager.

4.

The fallacy of Gulfstream's rationale of requiring the **"only winning ticket"** is two fold: 1. It does not take a separate paragraph to define the "only winning ticket", and 2. It is illogical (as lacking sense) that there could be only "one winning ticket" among the mass wagering population as there are simply too many parties involved in the activity, i.e trainers, owners, jockeys, their friends and family, (with the inside information) and then the general public.

It does not stand to reason that a member of the general public would have the only winning ticket and the trainer, owner, jockey, friends and family would not have wagered on their own horse. What does make sense and which is the modus operandi of Gulfstream Park is for horses with extreme high odds (which the general public would not be betting) to win the races and be covered with "wealthy insiders" having the "only winning ticket", i.e as on May 25, 2014, a wealthy bettor paid $7,603.20 for a Rainbow Pick 6 ticket and collected $6,678,939.00. All horses in three (3) races were combined in one ticket with one horse with high odds winning one of the races). And as recently as August 30, 2018, in the 9th race (Pick 6 race) Horse #2 paying $163.60 to win, Exhibit 2 attached hereto, paying out a Pick 6 Jackpot of $69,256.40 to the holder of the only winning ticket. As noted racing columnist Andrew Beyer stated "Gulfstream Park's Rainbow Pick 6 is an elusive and expensive pot of gold and is a sucker bet for the general public as they are hopelessly outgunned against larger waging bankrolls". To make a level playing ground and to eliminate the "buying of the jackpot" with "wealthy insiders" the following rule was implemented and it goes to the cost of the ticket:

(2) **Unique Wager**, as used in this subsection, shall be defined as having occurred when the **total amount wagered** on a winning combination selecting the first place finisher in each of the six races is **equal to the minimum allowable wager. ($.20 cents)**. But which has been intentionally and systematically ignored by Gulfstream officials. The terms and conditions as set out in (**Rule 61D-7.XXX Rainbow 6**) as comprising the terms and conditions of the "implied contract" between the parties herein are judged "objectively" by a "reasonable man" and not "subjectively" by the personal selfish opinions of Gulfstream personnel. **One does not need a separate paragraph defining the "only winning ticket". Speaks for itself**. Gulfstream argues that it is the **"custom"** of other racetracks around the country offering the Pick 6 wager to require the patron to have the **"only winning ticket"**. The fallacy however is that the other racetracks across the country do not have a published rule defining a **"unique ticket"** only requiring having the **"only winning ticket"** without any definition of what is "the only winning ticket". The insertion of a rule designating a **"unique ticket"** and its **definition** separates Gulfstream from the other racetracks offering the Pick 6 wager.

5.

Defendants extended an implied contract which was accepted by the Plaintiff, Ronnie Minnick thru the successful performance of the contract which under the Rainbow Pick 6 rules as having the only "unique wager" is entitled to the net jackpot pool of $173,445.00 as advertised on August 12, 2017, and $1,302,921.00 as advertised on December 26, 2019.

In addition as Gulfstream Park has systematically and intentionally ignored its own Pick 6 rules for the benefit of its wealthy patrons and its own financial corporate greed (the modus operandi of the Rainbow Pick 6) the exact and correct amount of the net Rainbow Pick 6 jackpot on August 12, 2017 and December 26, 2019 respectively for which the Plaintiff is entitled is unknown and cannot be ascertained without an accounting of the books and records of the Defendants.  The refusal by the Defendants to pay the proper amounts for the Rainbow Pick 6 "Unique Wagers" on August 12, 2017, and December 26, 2019 constitutes a) Breach of Contract, b) Deceptive Advertising and c) Violation of the Arkansas Deceptive Trade Practices Act as the wager herein made was made in Hot Springs National Park, Arkansas.

6.

The Defendant's Rainbow Pick 6 program is but a part of the overall "blinded by corporate greed" and "mismanagement and violation of the public trust" of the Defendant's horse racing operations operated under a "privilege license" granted by the states of operation.  The Rainbow Pick 6 was never intended to "pay out" and "change your life for twenty ((.20) cents" as advertised, instead intended to take into the corporate financial coffers a staggering twenty two (22%) of the daily betting pool.  Numerous instances abound when there was an apparent Pick 6 winner only to see a "twilight zone" event occur nullifying the winning horse, i.e jockey falling off at the finish line, disqualification, etc. being described as "highway robbery in broad daylight". Andrew Beyer, noted horse columnist, has called the Rainbow Pick 6 a "elusive and expensive pot of gold" , "an almost impossible challenge" and a "sucker's bet" to be avoided.  The Paulick Report a national recognized horse racing publication called an event on December 28, 2019, "Uncalled for Jockey Actions" wherein two brothers both being jockeys in the same race, in plain, open and obvious view, one brother clearly blocked a competing horse into the rail, in order for the other brother to win the race uncontested.  Yet the Gulfstream Park Stewards did nothing condoning a bad practice and precedent according to the Paulick Report.  There is no Racing Commission in Florida and Gulfstream Park operates with no regulation restraints.

7.

Corporate Greed at any Costs

Numerous lawsuits abound revealing the mismanagement, horrors, and turmoils of The Stronach Group's horse racing activities not only at Gulfstream Park but across the United States. At Santa Anita Race Track in California, owned and operated by the Stronach Group, fifty six (56) horses have died since July 2018 to December 2019. prompting a Los Angeles District Attorney's Office investigation. California Legislative officials, and the California Horse Racing Board also calling for an investigation and hearing of the Track's operations with much of the blame being placed on The Stronach Group in their efforts to "maximize profits." Stronach encouraged trainers who had been cited for using performance-affecting drugs to race horses that may not have had enough rest or in proper condition in a push to fill large race fields and to add more races. Stronach would limit or eliminate stall pace for trainers and owners who did not enter horses frequently enough to satisfy their race requirements. At the storied Pimlico Race Course, the City of Baltimore, Marland, sued the Stronach Group's corporate affiliates in an effort to acquire ownership by eminent domain of the Race Course due to corporate mismanagement.

The Stronach Group's own family members, Father Frank Stronach, Daughter, Belinda Stronach, Grandchildren are all suing each other over mismanagement asking for hundreds of millions of dollars in damages. Exhibit D. Keith Blackpool, former chairman of the California Horse Racing Board, has filed a 2018 lawsuit against the Stronach Group asking for Forty ($40) million dollars for Negligent Misrepresentation and Breach of the Implied Covenant of Good Faith and Fair Dealing among other causes of action. Exhibit E. Numerous trainers have called the Stronach Group the worse thing that has ever happened to horse racing.

Plaintiff ask for:

1) An affirmative declaratory judgment as to the legal meaning of:

**Rule 61D-7.XXX Rainbow 6**

(1) The Rainbow 6 requires selection of the first place finisher in each of six races. The entire net Rainbow 6 pool and carryover, if any, shall be distributed to the holder of a **unique wager** selecting the first place finisher in each of the selected six races. If there is no unique wager selecting the first place finisher in all six races, the major share of the Rainbow 6 pool shall be distributed as a single price pool to those who selected the first place finisher in the greatest number of races. The minor share shall be added to the, or create a, jackpot pool.

(2) **Unique Wager,** as used in this subsection, shall be defined as having occurred when the **total amount wagered** on a winning combination selecting the first place finisher in each of the six races is **equal to the minimum allowable wager.**

The terms and conditions of the agreement are to be judged "objectively" and not "subjectively" by personal opinions.

_/s/ Ronnie H. Minnick_
Ronnie H. Minnick
217 Lookout Point
Hot Springs National Park, Arkansas 71913
501.282.6008

Certificate of Service